IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| RANDAL ARMSTRONG, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CV06-49-S-EJL |
| | ) | |
| vs. | ) | **MEMORANDUM ORDER** |
| | ) | |
| TOM BEAUCLAIR, OLIVIA CRAVEN, | ) | |
| ROBIN SANDY, BUD BRINEGAR, ANNE | ) | |
| JANE DRESSEN, WES GREER, KEN | ) | |
| BENNETT, and CHERYL FIGURSKI, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court in this prisoner civil rights case are Plaintiff's Motion for

Summary Judgment (Docket No. 16) and Motion for Extension of Time to File Reply

(Docket No. 22).  Defendants recently submitted a Motion to Dismiss or Alternative

Motion for Summary Judgment (Docket No. 24), and Plaintiff has filed a Response.

Having reviewed the record, the Court has determined that oral argument is unnecessary.

Accordingly, the Court enters the following Order.

**I.**

**MEMORANDUM ORDER  1**

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**A.    Factual Background**

Plaintiff is an Idaho Department of Correction (IDOC) inmate who was seeking release on parole in June 2005.  Defendants in this case are Thomas Beauclair, former director of the IDOC; Ken Bennett, former warden of the IDOC facility where Plaintiff was housed; Olivia Craven, Executive Director of the Idaho Commission of Pardons and Parole; Wes Greer, a parole hearing officer; and Robin Sandy, Bud Brinegar, and Anne Jane Dressen, all members of the Idaho Parole Commission.  This case concerns whether Defendants violated Plaintiff's First Amendment rights in requiring him to attend a religiously-based prison rehabilitation program prior to considering his eligibility for parole after he informed them of his refusal to attend the program on religious grounds.

At sentencing, the state court had recommended that Plaintiff attend a therapeutic community or "RSAT" program during his incarceration.  *Complaint*, at p. 7 (Docket No. 3).  Plaintiff's "recommended case plan" developed by the prison required him to complete a drug or alcohol therapeutic community program.  *Plaintiff's Statement of Facts*, at ¶1 (Docket No. 16-5).  The only alcohol treatment component of the therapeutic community program available at the time was the Alcoholics Anonymous (AA) 12-Step program.  *See Original Complaint Exhibit B, Letter from IDOC Administrator of Operations Pam Sonnen* (pp. 1-2).

Plaintiff alleges that on April 14, 2005, during the interview to determine his suitability for parole, he told Defendant Wes Greer, a parole hearing officer, that he

**MEMORANDUM ORDER  2**

objected to the therapeutic community program on religious grounds.  Greer allegedly punished Plaintiff by giving him a Disciplinary Offense Report (DOR) and having him placed in segregation as a result of Plaintiff's refusal to sign up for the program.

On June 8, 2005, Plaintiff attended a scheduled parole hearing with Defendants Bud Brinegar, Anne Jane Dressen, Robin Sandy, and Olivia Craven.  Plaintiff alleges that after he told them that he refused to sign up for the therapeutic community program because of the religious nature of the AA component of the program, they voted to deny Plaintiff parole.  *Complaint*, at p. 9.

Plaintiff also alleges that in 2005, Defendant Ken Bennett, then the warden of South Idaho Correctional Facility (SICI) where Plaintiff was housed, instituted a policy of punishing inmates who did not follow their case plans, including case plans based on the therapeutic community, even though the therapeutic community required completion of the religious-based AA program.  Plaintiff alleges that on March 28, 2005, Defendant Cheryl Figurski, a counselor at SICI, punished Plaintiff with a loss of privileges after he refused to sign up for the RSAT program.  He also alleges that he complained to Defendant IDOC Director Tom Beauclair about the First Amendment violation, and Beauclair did nothing to resolve the issue.  Plaintiff alleges that Defendants Beauclair, Greer, Bennett and Figurski retaliated against him and punished him for refusing to participate in the religious program.  Plaintiff seeks declaratory relief, injunctive relief, and damages from Defendants.

In his current Motion for Summary Judgment, Plaintiff asserts entitlement to

**MEMORANDUM ORDER  3**

summary judgment on the claim that Defendants' action in requiring him to attend AA as a prerequisite for parole eligibility violated his First and Fourteenth Amendment rights. *See Plaintiff's Affidavit* (Docket No. 16-4).  The retaliation claim is not at issue in Plaintiff's Motion, and the Court previously dismissed Plaintiffs' claims based upon 42 U.S.C. §§ 1985 & 1986.

**B.      Standard of Law Governing Summary Judgment Motions**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

In a motion for summary judgment, the moving party bears the "initial burden of identifying for the court those portions of the record which demonstrate the absence of any genuine issues of material fact."  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)).  If the moving party points to portions of the record demonstrating that there appears to be no genuine issue of material fact as to claims or defenses at issue, the burden of production shifts to the non-moving party.  To meet its burden of production, the non-moving party "may not rest upon the mere allegations contained in his complaint, but he must set forth, by affidavits, exhibits or otherwise, specific facts showing that there

**MEMORANDUM ORDER  4**

is a genuine issue for trial."  Fed. R. Civ. P. 56; *see T.W. Electric Serv.*, 809 F.2d at 630 (internal citation omitted).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party.  All inferences that can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party.  *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted).

Rule 56(c) requires the Court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  The existence of a scintilla of evidence in support of the non-moving party's position is insufficient.  Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby*, 477 U.S. at 252.

## C.     Particular Constitutional Claims

To state a claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law.  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  Plaintiff alleges that Defendants violated his First and Fourteenth Amendment rights by their actions as stated above.  The United States Supreme Court has instructed the federal courts that, whenever possible, they should analyze constitutional claims using an "explicit textual source of constitutional protection," such as the Fourth Amendment, rather than using "the more generalized notion of 'substantive due process'" under the

**MEMORANDUM ORDER  5**

Fourteenth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Court previously determined that, under the *Graham* principle, Plaintiff's claim is more appropriately construed as a First Amendment claim than a Fourteenth Amendment substantive due process claim.

In addition, unless there is a state-created liberty interest in parole, then an inmate cannot pursue a due process claim. *See Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006) (If a state statute governing parole uses mandatory language like "shall" to "create a presumption that parole release will be granted," then an inmate has a liberty interest in parole and may bring a procedural due process challenge to a parole decision.). In *Banks v. State of Idaho*, 920 P.2d 905 (Idaho 1996), the Idaho Supreme Court, noting that the Idaho sentencing statute, I.C. § 19-2513, uses the nonmandatory words "[t]he offender may be considered for parole or discharge at any time during the indeterminate period of the sentence," held that, as a result of the statute's language, in Idaho "parole is not an automatic right or liberty interest." *Id*. at 908. The *Banks* decision governs Plaintiff's ability to bring a due process claim in a federal civil rights action. The *Sass* Court emphasized that "a State's highest court is the final judicial arbiter of the meaning of state statutes." 461 F.3d at 1127. As a result of *Sass* and *Banks*, the Court concludes that Plaintiff cannot pursue a due process claim.

**D.     Application of *Wilkinson v. Dotson* and *Heck v. Humphrey*  - Parole Commission Defendants**

Plaintiff alleges that his constitutional rights were violated when he was

**MEMORANDUM ORDER  6**

required to participate in a religious program in order to be eligible for parole.  In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the United States Supreme Court addressed the issue of whether an inmate could challenge a parole denial via § 1983 rather than habeas corpus.  The Court determined that an inmate may initiate a § 1983 action to seek invalidation of "state procedures used to deny parole eligibility . . . and parole suitability," but he may not seek "an injunction ordering his immediate or speedier release into the community."  544 U.S. at 82.  At most, an inmate can seek as a remedy "consideration of a new parole application" or "a new parole hearing," which may or may not result in an actual grant of parole.  *Id*.  In other words, the *Wilkinson v. Dotson* case identifies parole claims that are not barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).

In this action, Plaintiff is not seeking outright release on parole.  He is seeking declaratory relief, which the Court will construe broadly to include a request for injunctive relief to prevent defendants from using his refusal to attend a religious-based rehabilitative program as a factor in his parole consideration.  Based on the current state of the law, the Court concludes that Plaintiff is not barred from seeking such relief from allegedly unlawful parole eligibility requirements.

**E.    Plaintiff's First Amendment Establishment Clause/Freedom of Religion Claims - Parole Commissioners Sandy, Brinegar, and Dressen**

Defendants correctly assert that Plaintiff has alleged two separate violations -- a First Amendment Establishment Clause claim against one set of Defendants, and a First Amendment Retaliation claim against a different set of defendants (only Defendant Wes

**MEMORANDUM ORDER  7**

Greer is common to both claims).  The first set of defendants are Parole Commission members Robin Sandy, Bud Briengar and Anne Jane Dressen; Parole Commission Executive Director Olivia Craven; and Parole Hearing Officer Wes Greer.  These Defendants are alleged to have violated Plaintiff's First Amendment Establishment Clause rights in connection with requiring Plaintiff to complete the AA program  prior to parole eligibility.  The Court will refer to these defendants as the "Parole Commission Defendants."  Only the Establishment Clause claim against these Defendants is at issue in Plaintiff's Motion for Summary Judgment.

The second set of Defendants (collectively referred to as "IDOC Defendants") are former IDOC Director Tom Beauclair, Warden Ken Bennett, and Counselor Cheryl Figurski.  The claims against them arise from allegations that they punished Plaintiff in violation of his First Amendment rights for his refusal to attend AA.  The punishment included a disciplinary offense report (DOR) issued to Plaintiff by Defendant Greer and reclassification from minimum to medium custody.  This claim is not at issue in Plaintiff's Motion for Summary Judgment.

Plaintiff asserts that the Parole Commission Defendants questioned him about his refusal to attend the therapeutic community program, and that he explained that his refusal was based on the religious content of the program. This allegation is confirmed by the Parole Commission's minutes from Plaintiff's hearing that resulted in parole denial:

> Commissioner Sandy notes he requested to top out and notes he signed a refusal form with the Hearing Officer.  The subject said he did write on it that he wanted parole, but wrote he would not program.  He says

**MEMORANDUM ORDER  8**

he presented a parole plan to the Hearing Officer but said he had a disagreement with the Hearing Officer.  The Hearing Officer wanted him to sign up for RSAT but the subject refused because of his religious beliefs.

The Executive Director notes the Hearing Officer reported that the subject was argumentative and uncooperative.  The Officer called in another officer to witness this, but the subject says he would not participate in any program that is a religious cult.  He says he cannot go to that program because seven (7) of the first twelve (12) steps refer to God and he cannot support the use of God.  The Executive Director notes it is not religious but uses "higher power" as a part of the program.

Commissioner Sandy notes that a spiritual program does not refer to a religion.  The subject says Jesus is his Savior and he will not use that as a part of a program, as it goes against what he believes.  He say if he has to answer to anyone, it will be his own beliefs about God and the Bible.

*Plaintiff's Response to Motion for Summary Dismissal*, at Exhibit M, p. 2 (Docket No. 27-8).  *See also Olivia Craven Affiavit*, at ¶ 4 (Docket No. 17-2) ("at the hearing, the Commission also considered Armstrong's responses to questioning by Commission members and his explanation regarding the refusal form").

The exact timing relative to Plaintiff's June 2005 parole denial and the Commission's determination that there might have been an Establishment problem with AA is unclear.  However, the following additional evidence tends to support Plaintiff's claim.  A letter from Pam Sonnen, IDOC Administrator of Operations, dated December 21, 2005, states: "There have been some concerns with the spiritual content of the AA/NA and requiring offenders to participate in those meetings."  *Complaint*, at p. 14.  The Craven Affidavit also states that the Parole Commission is aware of the "controversy over whether or not the 12-step programs of Alcoholics and Narcotics Anonymous have a

**MEMORANDUM ORDER  9**

religious component," and states, that as a result, the Parole Commission made a policy

change in December 2005, allowing the parolee "an option of participating in either

AA/NA or the Beat Your Own Addiction Program, which is widely recognized as a

secular program."  Similarly, Scott Brooks, who was a Drug/Alcohol Rehabilitation

Specialist between 1999 and 2002, states in his Affidavit, "Many times successful

participation in TC is a factor when an inmate is being considered for parole," and that

"[p]rior to December of 2005, the TC drug/alcohol support groups were Alcoholics

Anonymous (AA) and Narcotics Anonymous (NA)."  *Affidavit of Scott Brooks*, at ¶¶ 5 &

7 (Docket No. 24-3).  Brooks further states that "[w]hile AA/NA have a spiritual

authority basis, BA (the new secular program) does not rely upon the recognition of a

higher spiritual authority."  *Id.* at ¶ 9.

 Plaintiff was denied parole in June 2005, prior to the December 2005, policy

change.  The Court concludes that the undisputed material facts support Plaintiff's

position that the AA program was required of him in June 2005, in order to achieve

parole eligibility, and that the AA program had a religious component.[1]

---

[1]  It cannot be seriously contended that AA does not have a religious component, and it
does not appear that Defendants, in this case, are defending on that basis.  In *Turner v. Hickman*,
342 F.Supp. 2d 887 (D.Cal. 2004), the Court comprehensively analyzed whether the NA
program, based upon the AA program, had religious content.  That Court reasoned:

 As disclosed by the record, the NA program plaintiff was required to
 attend is fundamentally religious, based as it is on the concept of a higher power
 to which participants must submit. *See Black's Law Dictionary* (8th ed. 2004)
 (defining "religion" as a "system of faith and worship usu. involving belief in a
 supreme being and usu. containing a moral or ethical code; esp., such a system
 recognized and practiced by a particular church, sect, or denomination. . . .").  The
 suggestion that plaintiff could meet the parole board's requirement of successful

**MEMORANDUM ORDER  10**

The law has been clear for many years that an inmate may not be forced to participate in a religiously-oriented prison program.  *See Warner v. Orange County Dep't of Prob.*, 115 F.3d 1068, 1074 (2d Cir. 1997); *Kerr v. Farrey*, 95 F.3d 472, 474 (7th Cir. 1996); *cf. Lee v. Weisman*, 505 U.S. 577, 587 (1992).

While there are several different First Amendment tests developed by the United States Supreme Court to address various factual circumstances where religion is at issue, this Court agrees with those courts that have applied the "coercion test" from *Lee v.*

---

completion of NA by "learn[ing] those 12 steps, work[ing] those 12 steps," by expressing a belief in "God" while reflecting on something completely at odds with all traditional notions of "God," simply is not creditable under the circumstances of this case. *See Kerr*, 95 F.3d at 480 (rejecting notion that "concept of God could include the non-religious idea of willpower within the individual," where case was not one in which religious references were merely "incidental"); *Warner*, 115 F.3d at 1076 (rejecting non-sectarian argument made by defendants because, inter alia, "the claim that non-sectarian religious exercise falls outside the First Amendment's scrutiny has been repeatedly rejected by the Supreme Court"). *See also Warburton*, 2 F.Supp.2d at 318 ("The emphasis placed on 'God,' spirituality and faith in a 'higher power' by twelve-step programs such as A.A. or N.A. clearly supports a determination that the underlying basis of these programs is religious . . ."); *Cox v. Miller*, 296 F.3d 89, 94, 108-09 n. 11 (2d Cir.2002), *cert. denied*, 537 U.S. 1192, 123 S.Ct. 1273, 154 L.Ed.2d 1026 (2003) (in reviewing claim of cleric-congregant privilege in habeas case, summarizing history of AA and concluding that AA's activities "must be treated as religious for purposes of [ ] Establishment Clause analysis"); *but see Stafford v. Harrison*, 766 F.Supp. 1014, 1016-17 (D.Kan.1991) (pre-*Warner* and -*Kerr* decision commenting that "[w]hile the spiritual nature of [AA] cannot be denied, the court is not persuaded this program may properly be characterized as a religion. The central text of the program ... refutes such a suggestion.... Further, the belief in a Supreme Being 'cannot be sustained as a distinguishing characteristic of religion.' " (citations omitted)).

     Based on the above, the undersigned recommends that this court join the Second and Seventh Circuits in their determination that requiring participation in NA is an establishment of religion prohibited by the First Amendment.

*Id*. at 896-97.

**MEMORANDUM ORDER  11**

*Weisman* to situations involving prison rehabilitative programs alleged to have religious

components.  *See Warner v. Orange County De't of Prob.*, 115 F.3d at 1074; *Kerr v.

Farrey*, 95 F.3d at 474; *Bobko v. Lavan*, 2005 WL 1309072, at *3 (D. Pa. May 31, 2005);

*Catala v. Commissioner, New Hamshire Dep't of Corr.*, 2005 WL 3133036 (D.N.H.

2005); *Turner v. Hickman*, 342 F.Supp. 2d 887 (D. Ca. 2004).

In *Catala*, the court explained the "coercion test" as follows:

> Forced attendance or coercion is shown if a prison official, a parole
> board, or another state actor requires an inmate to attend a program that
> emphasizes religion or faith as a condition of his probation or sentencing.
> In contrast, merely suggesting or recommending a religious program,
> without force or coercion or when secular opertions are equally available, is
> not a First Amendment violation.

2005 WL 3133036, at *1 (citations omitted).[2]

Defendants argue that Plaintiff has failed to show that his case plan contained a

religious component.  This is not really the issue.  Plaintiff's case plan required that he

attend a therapeutic community rehabilitative program, and the only rehabilitative

program available at the prison contained a religious component.  That the prison

program contained a religious component is not within the authority of the Parole

Commission Defendants to remedy; however, they violated the Establishment clause

when they did not relieve Plaintiff of the requirement to complete the only available

---

[2]  This Court agrees that the more complex test set forth in *Lemon v. Kurtzman*, 403 U.S.
602 (1971),  need not be applied if a program or circumstance fails the "coercion" test because
the program or circumstance would necessarily fail the second prong of *Lemon*.  The three
prongs of *Lemon* require the Court to examine whether the practice (1) has a secular purpose; (2)
whether it advances or inhibits religion in its principal or primary effect; and (3) whether it
fosters excessive entanglement between the state and religion.  *Id*. at 612-13.

**MEMORANDUM ORDER  12**

program (which had a religious component) after they knew of Plaintiff's religious-based

objections.  There being no genuine issue of material fact as to the elements of Plaintiff's

claim, the Court concludes that a declaratory ruling in Plaintiff's favor is warranted on

Plaintiff's Establishment Clause claim against Defendants Sandy, Brinegar, and Dressen,

the Commissioners who continued to require him to participate in AA/NA regardless of

his First Amendment objections.

## F.      Claim Against Olivia Craven

Olivia Craven is the executive director of the Idaho Commission of Pardons and

Parole.[3]  The Idaho Court of Appeals has characterized her statutory powers as follows:

> The executive director is described as the spokesperson for the
> Commission; however, the director is not a member of the Commission.
> Rather, the director serves as a full-time employee for the Commission. The
> director's duties include handling the daily administration of the
> Commission, acting as an advisor to the Commission, and acting as a
> liaison between the public and the Commission. A review of the pertinent
> statutes reveals that there is no prohibition against delegation of such
> authority to the director. As explained, the approval of recommended parole
> conditions is, pragmatically, part of the daily administration of the
> Commission. We agree that the Commission may lawfully delegate specific
> authority to the director to act in its behalf in approving the Board's
> recommended parole conditions.

*Mellinger v. Idaho Dept. of Corr.*, 757 P.2d 1213, 1219 (Idaho Ct. App. 1988).

It is clear from the Parole Commission minutes of Plaintiff's hearing that

---

[3]  Craven and Greer asserted a quasi-judicial immunity defense in their Response to
Plaintiff's Motion for Summary Judgment. *See Response*, at p. 7 (Docket No. 17).  The Court
considers "quasi-judicial immunity" to be absolute immunity.  Craven and Greer also assert
entitlement to qualified immunity, which the Court will discuss in the alternative herein below if
necessary.

**MEMORANDUM ORDER  13**

Defendant Craven was actively involved in the hearing denying parole; for example, the minutes reflect: "The Executive Director notes it [AA] is not religious but uses 'higher power' as a part of the program." *See Plaintiff's Response to Motion for Summary Dismissal*, at Exhibit M, p. 2 (Docket No. 27-8).  Because she has the authority to approve parole conditions, she advises the Commission, and she was personally involved in Plaintiff's denial of parole, including voicing her rejection of Plaintiff's Establishment Clause objections, a declaratory relief ruling against her is appropriate for the reasons stated above.

**G.     Claim Against Wes Greer**

Wes Greer's job as a parole hearing officer is to conduct pre-hearing interviews with inmates becoming eligible for parole.  *Greer Affidavit*, at ¶ 2 (Docket No. 17-3). Parole hearing officers report to the executive director of the Parole Commission.  *See Commission Organizational Chart*,  *available at* http://www2.state.id.us/parole.

Greer admits that he and Plaintiff discussed Plaintiff's refusal to participate in the therapeutic community program to address his alcohol/substance abuse.  *Id.* at ¶ 4.  Greer alleges that during the discussion, Plaintiff became argumentative and combative and eventually threw his questionnaire at Greer and said, "You are wasting my time."  *Id*. Plaintiff alleges that he discussed his objections to the religious content of the program with Greer. *Complaint*, at p. 22 (Docket No. 3).  Greer's DOR confirms that Plaintiff's objections to the religious nature of the program were discussed, and therefore there is no dispute that Greer was aware of Plaintiff's objections to the religious nature of the

**MEMORANDUM ORDER  14**

program. *See Complaint*, at p. 20.

Greer failed to take any action to correct the Establishment Clause violations after he became of aware of them. Plaintiff's behavior at the interview and his eventual parole denial are issues separate from the issue that no action was taken on Plaintiff's objection that his First Amendment rights were being violated. Defendant Greer was not entitled to simply ignore the Establishment Clause issue once he became aware of it. For the reasons set forth above, the Court will issue a declaratory relief ruling on Plaintiff's Establishment Clause claim against Defendant Greer.

## II.

### ALL DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

The Court now addresses those portions of all Defendants' Motion for Dismiss or Alternative Motion for Summary Judgment that have not been addressed above.

**A.    Argument that There is No Longer a Case or Controversy**

The Court rejects Defendants' argument that there is no longer a case or controversy in Plaintiff's case. Plaintiff was injured or damaged (1) when the Parole Commission Defendants required him to attend a religious based therapeutic community program in order to be eligible for parole, and (2) through the IDOC Defendants' alleged punishment of him for refusing to attend the program on religious grounds. Plaintiff's right to damages may have been cut off when the prison began to offer a new program that was secular in nature (assuming that they offered him an opportunity to enroll in it).

**MEMORANDUM ORDER  15**

However, just because Plaintiff's damages may have ceased at a particular point in time does not mean that they never existed at all.  A jury could determine that nominal damages are appropriate.

However, because this case is centered on parole issues, the Court will require briefing on whether inmates may obtain damages in the wake of *Wilkinson v. Dotson*. Based on its preliminary review of the law, the Court is inclined to conclude that damages remain available.  At this point, the Court disagrees with *Swimp v. Rubitschun*, 2006 WL 3370876 (D. Mich. 2006), where the Court concluded that a plaintiff challenging parole procedures can obtain only declaratory and injunctive relief in a civil rights action for unlawful parole procedures, and not damages.  That court reasoned:

> Although *Wilkinson* appears, on first blush, to control Plaintiff's complaint, its similarity to this case breaks down when consideration is given to the relief requested.  The *Wilkinson* plaintiffs sought declaratory and injunctive relief.  Unlike the *Wilkinson* plaintiffs, Plaintiff in this case seeks money damages for a flawed process.  Plaintiff would not, however, suffer damages based upon the Defendants' reliance on false information unless that false information resulted in the denial of parole.  The only meaningful money damages would be damages for a wrongful continued confinement.  In other words, Plaintiff's success on a claim for money damages would imply an erroneous parole decision. . . and [would be] subject to the habeas bar outlined in *Heck v. Humphrey*.

*Id*. at *3.

However, in *Wilkinson v. Dotson*, analyzing the precedential cases, the Court observed: "These cases, taken together, indicate that a state prisoner's § 1983 action is barred (absent prior invalidation) - no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or

**MEMORANDUM ORDER  16**

internal prison proceedings) - if success in that action would necessarily demonstrate the invalidity of confinement or its duration."  544 U.S. at 82-83.  In *Dotson*, the plaintiffs appear to have sought only injunctive relief; the *Dotson* Court did not foreclose the possibility that monetary damages could be available for a civil rights procedural violation.

**B.     Exhaustion of Administrative Remedies**

The Parole Commission Defendants argue that Plaintiff failed to exhaust his administrative remedies on his Establishment Clause claim.  Defendants argue that Idaho's "Self-Initiated Progress Report" ("SIPR") is an administrative remedy that Plaintiff should have pursued prior to filing suit.

The general rule is that litigants do not have to exhaust administrative remedies prior to filing a civil rights case under 42 U.S.C. § 1983.  *Porter v. Nussle*, 534 U.S. 516, 523 (2002).  Title 42 U.S.C. § 1997e(a) is an exception to the rule of nonexhaustion, which provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

It is clear from United States Supreme Court precedent, that § 1997e(a) is interpreted as a prison grievance system, not a state administrative remedy system, which comports with the general rule of nonexhaustion in § 1983 actions.  In *Jones v. Bock*, 127 S.Ct. 910 (2007), Chief Justice Roberts, writing for the unanimous Court, plainly

**MEMORANDUM ORDER  17**

observed: "[T]he PLRA mandates early judicial screening of prisoner complaints and requires prisoners to exhaust *prison grievance procedures* before filing suit." *Id*. at 914, *citing* 28 U.S.C. § 1915A & 42 U.S.C. § 1997e(a) (emphasis added).  Similarly, in *Porter v. Nussle*, another case focusing on 42 U.S.C. § 1997e(a), the Supreme Court began its opinion with this statement: "This case concerns the obligation of prisoners who claim denial of their federal rights while incarcerated to exhaust *prison grievance procedures* before seeking judicial relief."  534 U.S. at 519 (emphasis added).

Lower courts have also concluded the same.  *See Rumbles v. Hill*, 182 F.3d 1064, 1070 (9th Cir.1999), *overruled on other grounds by Booth v. Churner*, 532 U.S. 731 (2001) ("Legislative history [of the PLRA] also suggests that the statutory phrase 'administrative remedies' refers exclusively to prison grievance procedures"); *cf. Lacey v. C.S.P. Solano Medical Staff*, 990 F.Supp. 1199, 1206 (D.Ca. 1997) ("[f]ormer § 1997e was also directed toward exhaustion of institutional grievance systems, rather than toward general state tort claims-presentation procedures," and nothing in the revisions suggests that the intent was changed to encompass other state administrative remedy systems).

Idaho Administrative Code (IDAPA) § 50.01.01.500 (entitled "Self-Initiated Progress Report") (SIPR) provides: "An inmate may appeal the last parole decision of the commission."   Inmates may seek reconsideration of their parole denial no sooner than six months after the initial denial, and once per year after that.  IDAPA § 50.01.01, Paragraph 500.01.d.  "The petition "must state the reason reconsideration is requested and the circumstances that have changed since the last hearing."  IDAPA § 50.01.01, Paragraph

**MEMORANDUM ORDER  18**

500.01.c; *see Complaint Exhibits*, at p. 24 (Docket No. 3).

In light of the foregoing, the Court finds Defendants' argument that the SIPR is the equivalent of a prison grievance system untenable.  A grievance process does not require an inmate to prove how "circumstances have changed"; rather, it is for the opposite purpose, to request that the governmental body or its employees change.  A grievance process would not require an inmate to wait six months before complaining that he has been wronged by the governmental body.  It is clear that the SIPR is *not* a problem-solving mechanism, but a parole reconsideration process, focusing on changes the inmate has made to prove his eligibility for parole.  While it is unclear exactly what the SIPR process is, it appears to resemble a state administrative appeal.  Therefore, the Court concludes that Plaintiff was not required to exhaust this remedy under case law governing 42 U.S.C. § 1997e(a) and the general rule of § 1983 actions as to the Parole Commission Defendants on the Establishment Clause claim.

**C.      Official and Individual Capacity Issues**

Plaintiff has sued Defendants in their individual and official capacities.  The United States Supreme Court has determined that the Eleventh Amendment prohibits litigants from bringing suits for monetary damages against states, state agencies, and state officials acting in their official capacity.  *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993).  Suits for monetary damages against state actors "acting in their official capacities" are actually suits against the state, and are barred by the Eleventh Amendment.  Here,  Defendants are entitled to summary judgment on

**MEMORANDUM ORDER  19**

Plaintiff's claims for monetary damages against them in their official capacity.

However, the Eleventh Amendment does not bar suit against a government official for prospective injunctive relief only. *Ex parte Young*, 209 U.S. 123 (1908). Therefore, because prospective injunctive relief is being ordered, and potentially may be ordered on the remaining claims, the official capacity claims are not dismissed on that narrow basis.

Individual capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "A victory in such a suit is a 'victory against the individual defendant, rather than against the entity that employs him,'" and "[t]hus, the Eleventh Amendment prohibition against monetary damages imposed on a state does not apply. . . ." *Cerrato v. San Francisco Community College Dist.*, 26 F.3d 968, 973 (9th Cir. 1994). Individual capacity claims are subject to the defenses of absolute and qualified immunity, which the Court discusses below.

D. **Absolute Immunity: Parole Commission Defendants**

The United States Supreme Court has determined "that some officials perform 'special functions' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993). The Supreme Court has determined that common law immunity considerations "support[] a rule of absolute immunity for conduct of prosecutors that was 'intimately associated with the judicial phase of the criminal process.'" *Id.* at 270 (quoting *Imbler v. Pachtman*, 424 U.S. 409,

**MEMORANDUM ORDER  20**

430 (1976)).  Defendants who "seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz v. Economou*, 438 U.S. 478, 506 (1978).

Qualified immunity, which not as comprehensive as absolute liability, is generally deemed sufficient to protect the interests of government officials. *Buckley*, 509 U.S. at 268.  Case law provides no bright-line rule as to whether qualified or absolute immunity applies.  Rather, a court analyzing immunity issues must always look to the function being performed – whether it has a "functional tie to the judicial process," or whether it is merely investigatory.  *Genzler v. Longanbach*, 410 F.3d 630, 637 (9th Cir. 2005) (citing *Buckley*).

The Supreme Court has not addressed immunity for parole commissioners, but it has been clear that it is not the title, but the function, of a government actor that answers the question of whether absolute or qualified immunity applies.   For example, the Supreme Court has held that a prosecutor has absolute immunity for initiating and pursuing a criminal prosecution, *Imbler v. Pachtman*, 424 U.S. at 410, preparing and filing charging documents, *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997), and participating in probable cause hearings, *Burns v. Reed*, 500 U.S. 478 (1991).  The Supreme Court has extended only qualified immunity to an investigator for investigating criminal cases, *Buckley*, 509 U.S. at 273-74, or acting as the complaining witness in procuring an arrest warrant, *Malley v. Briggs*, 475 U.S. 335, 342 (1986).  Applying the function test, the Ninth Circuit has determined that a  prosecutor has only qualified

**MEMORANDUM ORDER  21**

immunity for "performing investigatory or administrative functions, or [when he] is

essentially functioning as a police officer or detective." *Broam v. Bogan*, 320 F.3d 1023,

1028 (9th Cir. 2003) (relying on *Buckley v. Fitzsimmons*).

In *Swift v. State of California*, 384 F.3d 1184 (9th Cir. 2004), the Ninth Circuit

Court of Appeals outlined the reach of absolute immunity regarding parole decisions:

> The Supreme Court has reserved deciding whether members of state parole boards have absolute quasi-judicial immunity for their official actions. *Martinez v. California*, 444 U.S. 277, 285 n. 11, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). We have held, however, that parole board members are entitled to absolute immunity when they perform "quasi-judicial" functions. *Anderson*, 714 F.2d at 909-10. Thus, parole board officials of the BPT are entitled to absolute quasi-judicial immunity for decisions "to grant, deny, or revoke parole" because these tasks are "functionally comparable" to tasks performed by judges. *Sellars*, 641 F.2d at 1303; *Bermudez v. Duenas*, 936 F.2d 1064, 1066 (9th Cir.1991) (holding *Sellars* immunity encompasses actions "taken when processing parole applications"). Absolute immunity has also been extended to parole officials for the "imposition of parole conditions" and the "execution of parole revocation procedures," tasks integrally related to an official's decision to grant or revoke parole. *Anderson*, 714 F.2d at 909.
>
> We have also explained, however, that parole officials are not "entitled to absolute immunity for conduct not requiring the exercise of quasi-judicial discretion." *Id*. "There is no reason to clothe actions taken outside an official's adjudicatory role with the absolute immunity tailored to the demands of that role." *Id*.

*Id*. at 1188-89.

Based on the function test, it is clear that Defendants Olivia Craven, Executive

Director of the Board of Pardons and Paroles, is entitled to absolute immunity for her

exercise of discretion in helping to create and enforce the policy requiring inmates to

complete the AA/NA program in order to be eligible for parole, and, in particular, her

**MEMORANDUM ORDER  22**

failure to remedy the circumstance in the face of Plaintiff's Establishment Clause objections.  Commissioners Sandy, Brinegar, and Dressen are entitled to absolute immunity for their decision to require Plaintiff to attend a religious-oriented rehabilitation program in order to qualify for parole in the face of Plaintiff's Establishment Clause objections.  Absolute immunity applies "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff."  *Ashelman v. Pope*, 793 F.2d 1072, 1075 (9th Cir. 1986) (internal citations omitted).  When absolute immunity applies, it means that a state actor is not liable for monetary damages.  *Stump v. Sparkman*, 435 U.S. 349 (1978).

It is less clear whether Wes Greer is entitled to absolute immunity.  Most cases dealing with parole officer immunity are based on facts different from those at bar.  However, while most of the cases relate to parole revocation recommendations and hearings, they are nevertheless helpful in analyzing Greer's immunity defense because they follow the Supreme Court's general rule that absolute immunity is a function-based determination.  In *Scotto v. Almenas*, 143 F.3d 105 (2d Cir. 1998), the Second Circuit Court of Appeals determined that  parole officers "are entitled to absolute immunity when they perform discretionary judicial functions, but not police-like, investigatory, or administrative functions.  *Accord, Hinton v. Moritz*, 11 F.Supp. 2d 272 (D. N.Y. 1998).

Here, Greer's duties were to conduct pre-hearing interviews with inmates becoming eligible for parole, to recommend to the Commission conditions of parole, and to recommend that parole be granted or denied.  The issue is whether Greer's actions

**MEMORANDUM ORDER  23**

were prosecutorial or adjudicatory in nature, to which absolutely immunity applies, or

investigatory or administrative in nature, to which only qualified immunity applies

(discussed directly below).  *See Scotto v. Alemanas*, 143 F.3d at 110-11.

Greer does not have the discretionary authority to set parole conditions or deny

inmates parole.  That duty belongs to the Commissioners and to the Executive Director, to

the extent that she aids the Commissioners.  Greer merely interviews the inmate,

recommends certain parole conditions, and recommends that parole be granted or denied.

*See Greer Affidavit*, (Docket No. 17-3).  Even though Greer's job is titled "Parole

Hearing Officer," his interactions with Plaintiff are referred to as  "a prehearing

interview," not a "hearing."  *See id.* at ¶ 2.

Accordingly, as in *Swift v. California*, this Court agrees that Plaintiff's facts are

much like *Scotto*'s facts, where qualified, rather than absolute, immunity applied:

> In *Miller*, we explained that a social worker's "decision to institute
> proceedings to make a child a ward of the state is functionally similar to the
> prosecutorial institution of a criminal proceeding" and "is likely entitled to
> absolute immunity." *Miller*, 335 F.3d at 898. By contrast, in *Scotto*, the
> Second Circuit reasoned that when a parole officer recommends that a
> senior official initiate parole revocation proceedings, the recommendation is
> not comparable to initiating a prosecution and is more analogous to "a
> police officer applying for an arrest warrant." *Scotto*, 143 F.3d at 112-13.
> The recommending officer is thus only entitled to qualified immunity, while
> the senior official who makes the discretionary decision to issue the warrant
> is the one who initiates the revocation "prosecution" and is absolutely
> immune. *Id*. at 113.

*Swift*, 384 F.3d at 1192 (citing *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003)).

Consequently, the Court concludes that Greer is not entitled to absolute immunity.

**MEMORANDUM ORDER  24**

The Court shall determine whether he is entitled to qualified immunity herein below.

**E.     Qualified Immunity**

In § 1983 actions, the doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly-established federal rights.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  In practical terms, the qualified immunity doctrine means that a state official may be held personally liable in a § 1983 action if he knew or should have known that he was violating a plaintiff's clearly-established federal rights.  *Id*.  True to its dual purposes of protecting state actors who act in good faith and redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The threshold question in considering application of the qualified immunity defense is whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).  If, viewing the alleged injuries in a light most favorable to the plaintiff, the Court finds that a constitutional right appears to have been violated, it proceeds to the next step, which is to inquire whether the right was clearly established.  *Id*.

Here, there is no question that Plaintiff has stated a valid claim, and that, if the facts alleged are true, the IDOC Defendants' conduct violated Plaintiff's rights.  The

**MEMORANDUM ORDER  25**

Court therefore proceeds to the next step of the *Saucier v. Katz* test, which is to determine whether the right was clearly established in June 2005.

To determine whether the right was clearly established, a federal district court turns to Supreme Court and governing circuit court cases existing at the time of the alleged act. *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996) (citation omitted). In the absence of binding precedent, the district courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established. *Id.* (citation omitted).

Here, there was no case from the Supreme Court or the Ninth Circuit addressing the propriety of coercing inmates to attend AA/NA at the time of the allegations, which was June 2005. This Court then determines to what extent it should look to other circuits and district courts to determine whether the law was clearly established. The Third Circuit entertained this question in *Williams v. Bitner*, 455 F.3d 186 (3d Cir. 2006). There, an inmate had brought a civil rights action asserting that his First Amendment rights were violated in March 2001 when he was punished for refusing to handle pork in his kitchen job because it was contrary to his religious beliefs. At the time of the incident, neither the United States Supreme Court nor the Third Circuit had "directly addressed whether requiring a Muslim inmate to handle pork violates his or her First Amendment right to free exercise of religion." *Id.* at 191. However, "the Fifth, Seventh, and Eighth Circuits, as well as a district court in the Eighth Circuit, had so held." *Id.* Those cases spanned the time period from 1974 to 1995.

**MEMORANDUM ORDER  26**

Based on those cases, the Third Circuit Court in *Williams* concluded that prison officials had been "fairly warned" that their alleged treatment of Williams was unconstitutional by very similar cases from other circuits, as well as less similar cases from the United States Supreme Court and from the Third Circuit's own prior cases.  *Id*. at 194.  As a result, it affirmed the district court's denial of qualified immunity.  *Id*.  The Third Circuit's analysis of whether case law from other circuits constituted "clearly established law," is instructive to the present case before this Court, because neither the United States Supreme Court nor the Ninth Circuit has directly addressed the issue of coerced participation in AA/NA prison rehabilitative programs.  The Court thus undertakes a similar analysis.

Here, Plaintiff's incident took place in June 2005.  In 1996, the Seventh Circuit Court of Appeals determined that coercing inmates to attend AA and NA violated the Establishment Clause of the First Amendment, but it afforded qualified immunity to prison officials, concluding that it could not say that "a reasonable prison official should have known that her actions were unlawful."   *Kerr v. Farrey*, 95 F.3d 472, 479 (7th Cir. 1996).   Since that date, the Second Circuit and various district courts have also rejected the use of AA and NA as mandatory rehabilitative tools based on the First Amendment.  *See Warner v. Orange County Dep't of Prob*., 115 F.3d 1068, 1074 (2d Cir. 1997); *Warburton v. Underwood*, 2 F.Supp. 2d 306 (D.N.Y. 1998) (finding that plaintiff stated an Establishment Clause claim regarding coerced participation in NA); *Ross v. Keelings*, 2 F.Supp. 2d 810 (D. Va. 1998); *Alexander v. Schenk*, 118 F.Supp. 2d 298 (D.N.Y. 2000);

**MEMORANDUM ORDER  27**

*Bausch v. Sumiec*, 139 F.Supp. 2d 1029 (D. Wis. 2001); *Bobko v. Lavan*, 2005 WL 1309072, at *3 (D. Pa. May 31, 2005); *Turner v. Hickman*, 342 F.Supp. 2d 887 (D. Ca. 2004).

In addition, in *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001), the court noted that AA had been an issue in the court below, where the magistrate judge had determined that the AA/NA requirement violated the Establishment Clause as a matter of law.  The issue was not presented on appeal, but the Third Circuit Court reversed the district court's decision that the plaintiff had not stated a retaliation claim for prison officials' punishment of the plaintiff for complaining about the religious content of the AA program.  *See also McCrohan v. Armould*, 1995 WL 691878 (D. Ca. 1995) (no First Amendment violation where it was suggested that the plaintiff attend Narcotics Anonymous meetings, but he was not forced to attend them).

In contrast, there are cases holding that AA/NA does not violate the Establishment Clause, but they pre-date the Seventh Circuit's decision in *Kerr*: (1) *Stafford v. Harrison*, 766 F.Supp. 1014 (D. Kan 1991); (2) *O'Connor v. State of Cal*., 855 F.Supp. 303 (D.Cal. 1994); (3) *Boyd v. Coughlin*, 914 F.Supp. 828 (D.N.Y.1996) (published in February 1996; *Kerr* was published in August 1996).  In addition, in *Scarpino v. Grosshiem*, 852 F.Supp. 798 (D. Iowa 1994), the Court granted qualified immunity to defendants who had coerced the plaintiffs into attending AA, and then noted: "This holding does not, of course, determine whether defendants' actions *did* violate the Establishment Clause, only that a reasonable official could have believed they did not" (emphasis in original).  *Id*. at 805.

**MEMORANDUM ORDER  28**

This Court now turns to the United States Supreme Court to determine whether, in addition to lower court cases, that Court put Defendants on notice that their actions violated the Establishment Clause.  For example, in denying qualified immunity under similar facts in 1998, the district court in *Warburton* relied in part on *Lee v. Weisman*, 505 U.S. 577 (1992).

In *Lee v. Weisman*, a public school student and his father brought suit seeking injunctive relief to prevent the public schools from having prayers at graduation ceremonies.  The Supreme Court held that the Establishment Clause prohibited schools from inviting clergy to give "nonsectarian' prayers at school graduation ceremonies. In so doing, the Court reasoned:

> The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause. It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which "establishes a [state] religion or religious faith, or tends to do so."

505 U.S. at 587.  The Court concluded that "[t]he prayer exercises in this case are especially improper because the State has in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student, one the objecting student had no real alternative to avoid."  *Id*. at 598.

Based on all of the foregoing case law, this Court concludes that it was clearly established -- as early as 1997 when two circuits had taken the same position and well before June 2005 -- that forced participation in AA/NA violates the Establishment Clause.

**MEMORANDUM ORDER  29**

Here, Defendants state it was not until December 2005 that they were "aware that there was a controversy over whether the 12-step AA program contained a religious component." *Craven Affidavit*, at ¶ 7 (Docket No. 17-1).  After several courts had ruled similarly to *Kerr* in the years following 1996, there was no longer a controversy.  Prison officials are not entitled to qualified immunity because they choose to keep themselves in the dark regarding changing areas of constitutional law.  Therefore, Defendants are not entitled to qualified immunity.

**F.     Conclusion**

The Court concluded above that there is no genuine issue of fact that the Parole Commission Defendants violated Plaintiff's Establishment Clause rights by requiring him to attend AA meetings as a prerequisite to parole eligibility.  That he was actually denied parole on other grounds is not at issue, and, indeed, cannot be at issue in a § 1983 action under *Wilkinson v. Dotson*.

Plaintiff is entitled to declaratory and injunctive relief on his Establishment Clause claim.  Petitioner should be afforded a new parole eligibility interview and hearing, where no consideration is given to the fact that he earlier refused to attend the prior religious-based rehabilitation program.  Such relief satisfies the concerns set forth in *Wilkinson v. Dotson* and complies with the Prison Litigation Reform Act (PLRA) (18 U.S.C. § 3626), inasmuch as the Court finds that such relief is narrowly drawn, extends no further than necessary to correct the Establishment Clause violation, and is the least intrusive means necessary to correct the violation.

**MEMORANDUM ORDER  30**

As for monetary damages, the Court concludes that Defendants Craven, Sandy, Brinegar, and Dressen are entitled to absolute immunity.  All claims against these Defendants for monetary relief are dismissed with prejudice.

Defendant Greer is not entitled to absolute immunity or qualified immunity on the Establishment Clause violation.  The parties may brief the issue of the availability of monetary damages for a parole claim in a civil rights action after *Wilkinson v. Dotson*. Defendants Beauclair, Greer, Bennett, and Figurski are not entitled to qualified immunity on the retaliation claim.  Their liability for monetary damages on the individual claims, and for prospective injunctive relief on the official capacity claims, remains at issue.

## IV.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 16) is GRANTED in part and DENIED in part as set forth herein above.  Plaintiff is entitled to declaratory relief on his Establishment Clause claim.  The Parole Commission Defendants shall afford Petitioner a new parole eligibility interview and hearing, where no consideration is given to the fact that he earlier refused to attend the prior religious-based rehabilitation program.

IT IS FURTHER HEREBY ORDERED that Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Docket No. 24), is GRANTED in part and DENIED in part.  All claims for monetary relief against Olivia Craven, Robin Sandy, Bud Brinegar, and Anne Jane Dressen are dismissed with prejudice.

**MEMORANDUM ORDER  31**

IT IS FURTHER HEREBY ORDERED that Plaintiff's Motion for Extension of Time to File Reply (Docket No. 22) is MOOT.

IT IS FURTHER HEREBY ORDERED that the remaining parties shall following this pretrial schedule:

A.   **Alternative Dispute Resolution (ADR)**.  Plaintiff and counsel for Defendants shall confer and select one of the following forms of ADR: judicially supervised settlement conference with United States District Court Magistrate Judges Mikel H. Williams or Larry M. Boyle, or mediation with a mediator selected by the parties.  The parties shall notify ADR Coordinator Denise Asper, Esq., of their choice of type and timing of mediation by **April 30, 2007.**  They may provide notification by telephone at 334-9067 or by written correspondence addressed to Ms. Asper at the U.S. District Court, 550 West Fort Street, MSC-042, Boise, ID  83724.

B.   **Completion of Discovery:**  All discovery shall be completed on or before **June 29, 2007.**  Discovery requests must be made far enough in advance to allow *completion* of the discovery in accordance with the applicable federal rules *prior* to this discovery cut-off date.

C.   **Dispositive Motions:**  All motions for summary judgment and other potentially dispositive motions shall be filed with accompanying briefs on

**MEMORANDUM ORDER  32**

or before **August 31, 2007.**  Responsive briefs to such motions shall be

filed within thirty (30) days after service of motions.  Reply briefs, if any,

shall be filed within fourteen (14) days after service of responses. All

motions, responses and replies shall conform to Rule 7.1 of the Local Rules

for the District of Idaho.

DATED:  **March 29, 2007**

Honorable Edward J. Lodge
U. S. District Judge

**MEMORANDUM ORDER  33**